Thank you, Your Honor, and may it please the Court. Mark Terry for the United Parcel Service. Your Honors, the United States Department of Transportation has applied a variety of physical qualification standards for the drivers of commercial trucks. Those standards, including the hearing standard at issue in this case, apply to more than 90 percent of the UPS fleet of more than 65,000 vehicles. The question in this case is whether UPS can lawfully extend the Department of Transportation's hearing standard to those small number of trucks that are not regulated by the Department of Transportation. The district court ruled that UPS cannot do so and that its attempt to do so and its current policy in which it does so violates the Americans with Disabilities Act. Let me ask you a factual question. Don't you have that same issue in respect to vision? Yes, Your Honor. We did have that same issue with respect to vision. We do apply a variance of the federal vision standard to monocular drivers, for example, and other drivers that cannot meet the DOT vision requirement. That litigation has been resolved for the most part on the basis that the affected individuals are not disabled within the meaning of the ADA, this Court so held. There is a remaining piece of it under the California State law, the FEHA, that is currently on appeal to this Court, and we argued in May before a different panel of this Court. But the core question applies not only to hearing, Judge Fletcher, to go to your point, but to the wide array of physical standards imposed by the DOT, which apply to vision, diabetes, hypertension, the use of all limbs. Didn't the Morton case at least decide, without deciding whether or not there was a demonstration, a demonstration of the business necessity defense, at least decide that the DOT's rules were not the fact that the DOT had the rule was not sufficient to meet the business necessity defense or otherwise to excuse non-accommodation of these people? I don't think it did, Your Honor, and I think that's one of the fundamental errors that the district court made in this case. The Court held in Morton that the DOT standard was not conclusive, was not sufficient in itself to satisfy the business necessity test. Exactly. And you seem to be standing up here and essentially arguing it is. Your Honor, I'm actually arguing a quite a bit more nuanced argument, if I can. What the Court said is that it's not conclusive, but it did not say that it has zero weight, and it could not have said that it has zero weight because the Supreme Court has repeatedly held that Federal standards do have probative evidence. That's the Criswell case. The Court in Criswell. And probative evidence as to what it applies to, but it doesn't apply to this. No, Your Honor. In the Criswell case, remember, the Federal standard applied to pilots, but it did not apply to flight engineers. The employer argued that it should simply be automatically allowed to move it over to flight engineers. The Supreme Court said, no, it's not conclusive, but it is probative, and it remanded it for a trial on this issue. And it said the probative value of the Federal standard depends on two things. One, whether the Federal standard is based on safety or some other determination. And two, whether the jobs at issue are congruent, whether the tasks are the same. And it drew that test from a case called Johnson v. The Mayor and City of Baltimore that was decided by the Supreme Court that same day. In this case, Your Honor, and in Morton, Your Honor, when the Court ruled that it was not, that the DOT standard was not exclusive, the Court cited Thurston for that proposition. I think the Court meant to cite Criswell respectfully because the parenthetical describing the flight engineers. In Thurston, the TWA flight engineers were not at issue. It's the Criswell case that involved this issue. On remand, UPS, the evidence at trial, established two things, more than two things, but the two relevant things. First, that the DOT safety hearing standard is safety-based. It's not based on administrative convenience or anything else. It is explicitly and unabashedly safety-based. In fact, when the Congress enacted the ADA, it directed all Federal agencies to take a look at their physical qualification standards to see if they were consistent with the ADA. The Department of Transportation twice reviewed the hearing standard. First, in 1993, in a study conducted by the plaintiff's expert in this case, concluded that there was no basis to depart from the standard because there was sufficient evidence that the safety risks of hearing-impaired drivers supported it. Second, in 1997, the DOT commissioned another study, again asking whether it should change its standard. And the authors of that study concluded that the DOT hearing standard was necessary to protect driver and public safety. And what did the DOT say about why it wasn't applying it to trucks less than 10,000 pounds? Your Honor, the DOT said two things. First, it said we are an agency of limited resources and we can't govern everything. Remember, DOT regulation involves more than just the driving requirements. Every DOT-regulated truck has to be registered with the DOT. Extensive paperwork has to be filed. The agency has to review the maintenance records and so forth. And the agency said the statute says 10,000 pounds, and that's been on the books, Your Honor, for 50 years. It's a historical relic. So we're going to do a cutoff at 10,000 pounds for resource allocation purposes. Then the agency said we think that's consistent with our mission because, and this is the important part, most vehicles that weigh below 10,000 pounds generally have safety characteristics similar to passenger cars. It did not say that all vehicles or that they always have those characteristics. And the evidence in this case established on remand that UPS packaged trucks do not have safety characteristics similar to passenger cars. They have safety characteristics similar to the 10,000 pound trucks regulated by DOT. This is nowhere more evident, Your Honor, than in the P500 truck, which is a version of the brown package truck you see on the streets of San Francisco every day, where there are two versions of that truck in the UPS fleet. The bodies are identical. They're manufactured by Grumman. But the chassis, one is manufactured by Ford, one is manufactured by GM. One weighs a little over 10,000 pounds. One weighs a little under 10,000 pounds. The effect of the district court's ruling in this case, Your Honors, is that Federal law prohibits a driver who cannot meet the DOT hearing standard from driving the GM version, but that UPS is required by a different Federal law to allow the same driver to drive the Ford version, a vehicle that is in all outward respects identical, whose safety characteristics are identical. Kagan in the district court opinion preclude specific rules for specific trucks? Your Honor, the district court ordered UPS to stop using the DOT standards. So we would have to give every driver an individualized assessment under a test that simply doesn't exist. I mean, there's a second problem with the district court's ruling. There's three problems. To answer Judge Berzon's question, did not the district court specify the trucks that it applied to? Yes, Your Honor. All non-DOT trucks. Every truck that weighs less than 10,000 pounds. He made no exception for the heavy trucks as opposed to the light trucks. And, Your Honor, it's a fallacy that there are any light trucks. The smallest truck in our fleet, the P-20, which is a Ford Aerostar, fully loaded with packages, weighs almost 8,000 pounds. That's the size of three Toyota Corollas. These are not small vehicles. These are loaded delivery cars. They don't have rear-view windows. They don't have side-view windows. They are commercial vehicles. And the safety standards that apply to commercial vehicles in the employer's judgment ought to apply to the entire fleet. This 10,000-pound cutoff, is that weight without load or weight with load? It's both, Your Honor. It's either gross vehicle weight rating, which is the manufacturer's rating for what the truck should weigh fully loaded, or the actual weight as it goes out the door. It's the higher of the two. But the smallest trucks will never weigh over 10,000 pounds because the springs and so forth can't hold them. It's also important to note that the 10,000 pounds — What about the ones you were just talking about that are almost the same? Presumably, you put a few packages in the smaller one, it's going to go over 10,000 pounds. Your Honor, actually, there's no evidence that that is the case, and I'm not sure it's true. There are some limitations on how much you can put in these trucks. You'd have to put about 50 pounds in, according to you. They're 90, 360 pounds. You'd have to put in 740 pounds. Counsel — But that's — the rating is with a normal load, Your Honor, so you'd be talking about an overloaded truck. Oh, I see. What's the rationale, then, for DOT saying that the lighter trucks, these standards do not apply to, and the heavier trucks, they do? Well, I think the rationale is that the old version of the DOT regulations applied to things like contractors' pickup trucks and other just general-duty vehicles that were used commercially, and the agency said, we can't track these millions of vehicles that are on the road. There's no reason for us to have them registered and have their maintenance performed at a DOT facility. I don't think the agency was making any determination that a regular commercial delivery vehicle whose function is, in all respects, identical to the vehicles that did continue to regulate wouldn't be subject to the standards. And again, I'll bring the Court back to the Criswell case and that Johnson v. Baltimore case, which focused specifically on the question. If the tasks are identical, then the employer may apply the Federal standard beyond its precise scope. And the evidence in the record, and this is at ER 108 and 09 from Mr. Brown, one of our safety experts, was that the tasks are identical. No matter how much the truck weighs, the tasks are identical, and there was no evidence to the contrary. And that easily satisfies the Criswell standard. The error that the district court made on Morton prong one, Your Honor, is not that the DOT standard is dispositive. The court ruled on that in Morton. We've never argued against it. The error that the court made is that the court said, at the end of the day, I find the evidence to be in equipoise. I can't tell. And therefore, the tie goes to the plaintiff because UPS has the burden of proof. But if the court had given even the merest weight to the fact that the Department of Transportation had promulgated these standards and had twice reasserted them after the ADA – I'm sorry, Your Honor. If we're in that order, is that statement of the court to be found? Your Honor, it is ER 302. The evidence is inconclusive as to whether deaf drivers pose an increased risk compared with hearing drivers. That's a quote from the opinion. So basically, he's saying it's a tie. But he gave no weight – and this is at ER 300 – he gave – expressly gave no weight to the existence of the DOT standard based on the court's misreading of Morton as saying where the court said it was not conclusive, the district court said it was irrelevant. And the plaintiffs make the same mistake in this court at page 37 of their brief. The EEOC repeats that mistake in this court and says that the standard is inapplicable. Our point is not that it provides the answer, but that it is relevant evidence on the question. And if the other evidence is in equipoise, giving some weight to the DOT standard should tip the scale to UPS's favor because, as I said, Criswell said the employer may import safety standards in those circumstances. I'd like to turn your attention to kind of another issue. You spoke about some of the trucks not having side mirrors, not having this and that. You have never – UPS has never tried to look at what a reasonable accommodation would be. Is that correct? Your Honor, for hearing, we have always applied the DOT standard across the board, and let me explain why. As I said, the DOT – Let me answer my question first. You never have tried to look at reasonable accommodation. No, Your Honor. We have never tried to accommodate a driver that can't meet the DOT hearing standard. The reason for that, Your Honor, is that the DOT regulates, as I said, a variety of physical qualifications. For some of them, such as vision and diabetes, the agency has determined that deviations from the strict standard can be made consistent with safety. In those cases, UPS has adopted revised protocols that allow a few people to drive. It's only about 100 in the whole fleet, Your Honor, out of 65,000 drivers. For hearing, the DOT, again, has twice looked at the question, and for this small subset of hearing impaired drivers – and I'd like to emphasize this. This is not a case about all deaf drivers. This is – many people who identify themselves as deaf or hard of hearing drive today for UPS. The named plaintiff in this case, Eric Bates, who's here in this courtroom today, drives today for UPS. Your Honor, it is for the very small subset of people who cannot meet the DOT hearing standard. Those are not all deaf people. Those are a very small subset. The DOT has twice looked at the question and determined that it could not find a basis on which to further subdivide those individuals into risk categories. That goes to the second prong of Morton, where this Court held – and I'm going to quote – that if UPS were able to show that empirical evidence in this area is so difficult to come by that it is impossible to identify specific risk factors, and then use those factors to sort disabled applicants, then UPS might meet the business necessity test. And it – One sort of strange hole in the record is that there's neither party put on any evidence about what other similar employers do. And one obvious way to develop some empirical evidence would be to look at that, but neither party put it on. We don't know what FedEx does. We don't know what the mail service does. We don't know what anybody else does. Your Honor, we don't know. There is nothing in the record. That's correct. The answer from the UPS side is we don't know what our competitors do. We don't discuss driver qualification standards with them. I mean, those are our two fiercest competitors, and we don't go around sharing what might be competitively sensitive information. It was not developed in the course of this lawsuit. Why the plaintiffs didn't do it, they promised, or they represented at the district court at about four different places in the trial, including at the close of their evidence, that they planned to do so, and they never did. I don't think it's an evidentiary hole, however, Your Honor, because what one employer chooses to do is not dispositive of what another employer does. No, but it would be an empirical evidence. Well, Your Honor, in the absence of any evidence that they do anything other than what UPS does, I don't think you can draw an inference one way or the other. It was certainly within the rules of the statute. I'm not drawing an inference. I'm just noting that there are ways one could do empirical research and fill this hole. Including that, there are probably others as well. Your Honor, I think that's a fair point, and it leads to a very important one, though, for UPS. UPS is an employer. UPS is a deliverer of packages. UPS is not a commissioner of primary scientific research. The employer's burden under the ADA is not to go out and commission tests and develop computer simulators and do this and that to find out whether the government got it right. Well, sometimes it might be. Let's suppose there was no government rule here at all. I'm not sure I agree with your characterization of the role of the government rule, but suppose there wasn't one. And if you wanted to impose a rule like this, presumably you would have to prove up in some fashion, and it might involve computer simulations and so on. I mean, in Title VII cases, for example, there's a long history with regard to test validation, which did put a burden on the employers to do some direct empirical research. And UPS is not, you know, a little mouse. It's a large and substantial organization. So if there is a way to prove it up and it hasn't been proved up, that seems to have some evidentiary significance, does it not? I would agree with you, Your Honor. If there were no government rule, we would have a different case. The fact is we do have a government rule. And the history of litigation involving the ADA and the driving companies, and this goes back to the ADA claims, too, that went up in Rodriguez and Teamsters, that the employers at some level don't have to commission research, and that if the evidence is, as the Court said, inconclusive, then giving some hand to the government requirement, too. In Arlene, for example, the Court, the Supreme Court said the Court should generally defer to the reasonable medical and safety judgments bade by public health agencies. In Bragdon v. Ed. One thing we do have is we have a big public health agency here, which is California Department of Motor Vehicles, which does allow these people to drive these trucks. Is that right? Your Honor, it does. It allows them to drive passenger cars. They may, under some circumstances, be able to drive a commercial vehicle for some other company, not for UPS. I'm sorry. Just a minute. They are licensed to do this. Is that correct? They are licensed to drive passenger cars, Your Honor. They're not licensed to drive commercial vehicles as well? Do they have to go out and get another license if they were going to drive? They have to get another license to drive, an interest rate license to drive if they don't pass the DOT standard to drive an over 10,000-pound commercial vehicle. I understand that. Correct. I'm talking about for these trucks that they want now to drive, if you said, fine, you can drive them, would they have to go get anything else from DMV? No, Your Honor. They would not. So they are licensed to drive these trucks as far as DMV is concerned. That's correct. DMV doesn't regulate these trucks. So we're faced with the DMV standard, which applies, though, generally to passenger cars. The DMV doesn't regulate, for the most part, any commercial vehicle. I'm sorry. I'm not understanding that. The DMV does have certain rules about certain specialized licenses, does it not, for certain specialized vehicles. And this is not or circumstances. And also, it does not allow certain disabled people to drive in certain circumstances. And despite that, this does not apply to them. Your Honor, I don't believe that there is a California State law prohibition on these people driving these trucks. And there are, say, California State law prohibitions on certain people driving certain vehicles. Yes, Your Honor. But that brings up one more point, and I see I'm just about out of time. We don't know if any of these individuals can drive these trucks because they didn't prove up their qualifications. We covered this in our brief. But they called all these witnesses to the stand that said, I want to drive, and they never proved that they had any driver's license, much less a commercial driver's license. They didn't prove that they had a clean driving record. They didn't prove that they met any of the unchecked. We don't know from the record that the two people in particular have driver's licenses? We know that the two people they put up have driver's licenses. We don't know that they meet other requirements of the qualification standard. If I could save my one minute, Your Honor, I'd appreciate it. Thank you very much. Thank you. Well, that's interesting. I didn't know that did that. I'm pleased to see that it does. If it pleases the Court, my name is Lawrence Parody. My colleague is Todd Schneider. And also here today is Barbara Sloan from the Equal Employment Opportunity Commission, who will be speaking for five minutes. We represent the plaintiff class, the appellees here. The argument that Mr. Perry just presented is essentially asking this Court to overturn the factual rulings, determinations of Judge Henderson. Judge Henderson followed this Court's guidance as set forth in Morton. Morton said that Your Honor, in Morton, ruled that UPS could not simply apply the DOT standards to non-DOT regulated vehicles. And in Morton, the Court said UPS has to – that the DOT standard could not shoulder the statutory burden under the ADA that any employer has to justify an across-the-board policy that excludes an entire class of disabled employees. Evidence was presented to Judge Henderson on both sides in a month-long bench trial. And Judge Henderson did not ignore the DOT standard. He just, following Morton, said the mere existence of the DOT standard on its own is not a sufficient basis. And he looked to the actual expert testimony presented by both sides. Now, one thing Mr. Perry said that should be corrected is the DOT, in its reasoning for deciding not to regulate the under-10,000-pound vehicles, was actually responded to a comment submitted by UPS. UPS asked the DOT in the comments to regulate the under-10,000-pound vehicles for the precise reason UPS has asserted here, arguing to the DOT that the under-10,000-pound vehicles have similar characteristics and pose similar risks. The DOT in the Federal Register rejected UPS's argument and said no. Judge Henderson noted that in the Court, and Morton noted that. In Criswell, the Supreme Court reached a similar conclusion in terms of the employer there sought to apply a DOT age requirement that applied to pilots. The DOT said pilots could not be older than 60. Western Airlines sought to apply the same rule to flight engineers and said, well, they have similar tasks at times. The Supreme Court in Criswell said that an employer under the ADEA has an independent obligation to substantiate such an exclusionary policy, has to present evidence to justify extending a DOT policy beyond the scope to which the DOT itself was regulating. But is one way, perhaps, of demonstrating, meeting that independent obligation of demonstrating the similarity of the circumstances that aren't covered by the regulation to the ones that are covered by the regulation? I mean, if, for example, you know, there was a truck that weighed 9,999 pounds, could they, and they were willing to just argue about that one truck, could they come in and say, well, at least as to the truck that weighs 9,999 pounds, there's no way the DOT's determination, which has some weight, ought to be applicable? Well, it could. It's a factor. But Judge Henderson followed the guidance set forth in Morton and in the ADA and by Congress in the congressional record of the ADA that says if an employer is going to exclude, have a policy that excludes a class, the employer must narrowly tailor that policy so that it actually measures the abilities of the disabled applicants. Judge Henderson, looking at all of the evidence, including the DOT regulation and the expert testimony and the anecdotal testimony presented by UPS, found that there simply was no evidence showing that hearing-impaired drivers actually pose a greater risk in that situation. And that's a factual finding. My understanding is that what he said was essentially the evidence is an equipoise. Therefore, they haven't met their burden, and it obviously matters whether you think they had the burden. But so this is a case in which the burden of proof really matters. It was critical. And the ADA makes it very clear that this is an affirmative defense. It says that an employer, to exclude disabled applicants based on their disability, a qualification standard, that the employer must show that the – it's a true business necessity and that there's no less discriminatory alternative. But it also says very confusingly – I find this statute very hard to read. It also says very confusingly that you need to be a qualified person with a disability to get your foot in the door to begin with, or it doesn't. Oh, it does. And Your Honor, in the Morton case, parsed out how this – how the statutory framework should work and said that it makes no sense to put the burden on a plaintiff to disprove in his prima facie case what is clearly an affirmative defense by the employer. And Your Honor, in Morton, noted the congressional intent was very clear that Congress wanted to require, to put employers to the test of justifying a policy that excludes. So what does qualified person with a disability mean in this context, and how do your plaintiffs meet it? Does it mean, for example, that they – is it sufficient that they have a driver's license, that they're employed by UPS, basically, period, and everything else goes into defense? Well, there has to be an initial prerequisites to show that an employee or applicant is qualified, and that's what Judge Henderson did with these two individuals. He looked at their driving record. Mr. O'Leary – Mr. Habib has 27 years' experience without any evidence of accidents. He looked at Mr. O'Leary's driving record. He – I'm sorry. Who had 27 years' experience? Mr. Habib. He's a – I thought there was basically no record about him. No, he – there's evidence in the record that he has a driver's license, that he has 27 years' experience, that he drives a tug on UPS's own property for four years. Right. There's a grievance filed by Mr. Habib that's noted in the record where he has been seeking for the last five years to have an opportunity to compete for a job that he has the seniority for. So Judge Henderson looked at his seniority, found he had the seniority, looked at did there was anything in his driving record that showed that he was an unsafe driver. Judge Henderson noted that UPS had challenged the driving record of other class members who testified, and over a dozen class members testified about being – wanting to be drivers and being denied that opportunity. Judge Henderson noted that UPS never raised even a suggestion, either in the arbitration – in the union grievance process – If you really have a burden on that, you probably haven't met it. So the real question is, do you have the burden on it? In other words, what is the qualification that you have to prove? Because what – see, what's happening here, as I understand it, is that because of this hearing standard, they are not looking into these other things. They're sort of barring the door and saying, we don't really care what your qualifications are because – otherwise, because you can't hear. So under those circumstances, what is the burden going in of the plaintiff where the – there's a sort of door barrier going on in the other side, or otherwise we would know what those qualifications are because they would have been developed by the employer. But they weren't developed by the employer here. I think what Judge Henderson did in applying Morden was to say, do these two individuals meet every qualification standard other than disproving the affirmative defense that UPS clearly has, i.e., showing that deaf people pose no greater risk. Clearly, that's an affirmative defense of the employer, particularly in a class action. UPS never engaged in any interactive process, any individualized assessment of these individuals. UPS simply applied this across-the-board policy. So aside from that policy, which is itself at issue, and which is the employer's ability to justify, Judge Henderson said, do these two individuals meet all the other qualifications? And they did. He found that they did, and there's ample evidence in the record that they did. I'm wondering whether the qualification even needs to be addressed when you have a blanket blanking out of a group of people. Maybe that's just enough. And then if that would go to the liability phase, and then you come to the remedy phase, and each individual would have to show that he or she, in fact, was qualified, had a driver's license, had a good driving record. Yes, Judge Fletcher. Judge Henderson noted that it might be enough, even without any evidence of any individuals being qualified in Stage 1 of a bifurcated class action. Well, I wonder about that, because here, where they've said you can't even apply, why should they at this point have to show their qualifications? All they need to show is that they're deaf. That should be enough when you're challenging across-the-board policy. Congress, in the House committee report that's cited in Morden, said, quote, if a person with a disability meets all selection criteria except one that he cannot meet because of a disability, the criterion must concern an essential function of the job and be carefully tailored to measure the actual ability. There's no dispute here that UPS has a qualification criteria that screens out people with a hearing impairment that don't meet the DOT standard, and that UPS has never made any effort to carefully tailor that standard to ensure that it's actually necessary and actually measures the ability of these applicants. I note that I'm at nine minutes left, and I do want to reserve five minutes for Ms. Hogg. I know. I'm watching with you. Go ahead. Okay. This is not – it would be a harder case if we had not submitted actual evidence that these two individuals were qualified in every way except for disproving this affirmative defense. But we actually did establish that, which makes this a much easier case. And what UPS is doing here is trying to ask this court of appeals to overturn factual findings. Judge Henderson noted that UPS failed to show that deaf people actually overall actually pose a greater risk, looking at all of the scientific evidence. And UPS had every opportunity and tried its best to convince the fact finder that deaf people pose a greater risk. There was simply a failure of proof on that issue, just as there was a failure of proof that the Supreme Court noted in Criswell. The employer in that case had an opportunity to try and convince the fact finder that age was a proxy for increased risk, and the employer failed to. Similarly here, too. UPS failed to convince the fact finder of that. Number two, UPS failed to convince the fact finder that whatever risk might be posed by hearing-impaired drivers is greater than other risks that UPS already accepts for particular categories. Again, applying the standards set forth in the law. Is there any record particularly on that question? In other words, I'm not sure how you would do it because there's such a paucity of information with regard to the deaf drivers, but is there a record with regard to, for example, the driving record or accident record of non-hearing-impaired drivers that is accepted by the UPS? Well, no. UPS does not track that. UPS developed these two protocols for driver applicants with vision impairments and with diabetes. Right. UPS maintained these protocols, and UPS's explanation for these protocols is that when the ADA was passed, it realized it had an obligation to try and accommodate driver applicants with disabilities, and thus it established these standards that are less than the DOT standards for these other categories. And Judge Henderson in his ruling noted that there are 87 drivers with other disabilities that UPS employs who don't meet DOT standards. And it's not a question of do they fit a waiver or not. Those who fit a waiver are allowed to drive the over 10,000-pound vehicles. The question UPS actually decided voluntarily to develop less restrictive standards for under 10,000-pound vehicle drivers, and it did so by hiring an expert to go and look at what is really needed in terms of vision to drive safely. But UPS never did that for hearing-impaired drivers, never even tried to assess whether they pose a greater risk. If they do, are there ways to mitigate it? And was there a study in the record, which I don't know if it was done by UPS, a relatively recent one, which asked people how much hearing ‑‑ it wasn't a survey of data, but a sort of survey of people's opinions about how much hearing mattered? Yes. This was called a human factors investigation. It was done by the DOT. And Judge Henderson carefully evaluated the evidence regarding that study. So has UPS done any study that's in the record on its own? No, Your Honor. And Judge Henderson noted that UPS still, despite the advice that was set forth in Morden, years ago this Court advised UPS, if you want to justify an across-the-board hearing policy that goes beyond ‑‑ to vehicles the DOT has not ‑‑ has declined to cover, you have to justify that and you have to investigate that. UPS did hire an expert for this case. But Judge Henderson found that expert's testimony to be one‑sided and to be entirely subjective and simply not persuasive when compared to the objective evidence presented by Dr. Sanger, who looked at all of the crash rate data and all of the objective issues ‑‑ evidence and concluded that there was no reason to think deaf people actually posed a greater risk. Okay. You're now getting into the five minutes. Yes. So thank you very much. Thank you, Your Honor. This is very neat. Counsel. May it please the Court. Barbara Sloan for the EEOC. I wanted to mention one thing that the plaintiff's attorney passed to me. They said that the Court should look at page 2. Sorry. I know. I have a very quiet voice. I'm really sorry about that. On page ‑‑ they passed to me a note of page ER299 apparently is where the district court addressed the question of the level of risk that EEOC ‑‑ that UPS tolerates. I was going to mention that. Our main interest in this case is, of course, with the application of Teamsters to a pattern of practice under the ADA. We believe that the district court was correct in determining that the Teamsters framework was appropriate for an ADA class action or an EEOC suit and that the school correctly applied the standard. I have a hard time understanding why Teamsters has anything to do with this for the following reason. Teamsters was ‑‑ the pattern and practice showing in Teamsters was a way of proving that there was a discriminatory policy. Here we know there's a discriminatory policy. They wrote it down. We know what the policy is. The policy is that certain people can drive the trucks. So all of the work that is done in Teamsters by the pattern and practice is done here by having an announced policy. So what's the pertinence of Teamsters? Well, Teamsters, one of the things that's important in Teamsters is that it says that what the plaintiff has to do in phase one of a bifurcated proceeding, and I think in that regard it's relevant because we've got bifurcated proceedings here and an endorsement of a bifurcated proceeding. And in phase one of a bifurcated proceeding, what the plaintiff has to do is present enough evidence to raise an inference that there's an illegal policy here. That's what Judge Henderson did. He looked at the evidence and he said, looking at the way the ADA is framed, where there's a burden here for the plaintiffs to show that there's a discriminatory policy, one that screens out individuals with a disability because of a disability. This one screens out everybody. That's over in 30 seconds. We look at the piece of paper. Okay, here's the policy. We're done. What was the rest of the trial about? It wasn't about any Teamsters. And that's why this case is different from other cases that the defendant has cited, like Sutton or I think they cited something called Sullivan and Conroy, where there are issues where it's a question of the policy doesn't screen out only people with disabilities. This one does. Admittedly, it does. But the plaintiffs also have to show that it's a discriminatory policy. It's unlawful. And it's unlawful if it screens out people with a disability and it's not job-related or consistent with business necessity, which is the employer's burden. Qualifications enters. There's really do you, Your Honor, asked Mr. Paradis, well, what's the role of the, how does qualifications work here? It seems to me there's two questions here. The first is what do you have to show to show an unlawful policy? And it seems to me that what you have to show is that it doesn't, as Judge Henderson said, the policy doesn't, the people screened out aren't categorically unqualified. There are clearly people in this class who can do the minimum, can meet the minimum requirements that UPS sets for people to drive their trucks. They have the driver's license. We know there are people who have driver's license. Ms. Jana Morton had a driver's license. She met the minimum qualifications to be a driver. We know Mr. Habib did. We know that he had sufficient seniority to bid on one of these jobs. We know Mr. Oloyed had a clean driving record. We know the class contains people who can do these, meet these qualifications. And they've never been allowed to pass to step two, which is the road test. It's a four-step procedure, and they've met step one, and that's all they've been allowed to do. And that, showing that, unless the employer can show that it's job-related and consistent with business necessity, which is to say that the qualification requirement actually measures people's ability to do the job, which this one doesn't because there are people in the class who can do it. An injunction is appropriate. An injunction is particularly appropriate in a case like this because, number one, it's a blanket exclusion policy, so everyone's screened out. There's no chance for people who are deaf to get an equal employment opportunity, which is, of course, the basic purpose of the ADA. And also, these jobs are pretty scarce. If they had to challenge the rule on a case-by-case basis, the job would be gone before they could even bid on it. UPS makes a big point of the fact that there aren't that many jobs like this. And also, having a policy like this deters people who could do the jobs from even working at UPS because why bother? The best you can do right now, UPS cabins these people in jobs like sorters or loaders. They don't get to do what are the creme jobs at this company, which is driving. But if we, in this case, think that the at least two of the class members, in fact, demonstrate adequately that they're qualified, does any of the ‑‑ I'm having a very hard time understanding the structure here. Does this matter? If we have two members of the class who actually are qualified, don't we simply proceed at that point to the merits of the question of whether the business necessity defense has been made out? I understand it's a bifurcated trial. You'll then go to any individual claims because it's a class action, but I'm still having a hard time understanding. Teamsters might matter if we had the government coming in and bringing a case like Teamsters without any demonstrative plaintiffs who were covered. And as you say, since the policy appears to include qualified people, that might be enough for an injunction. But in this case, does any of this matter? I think all of it matters, Your Honor. You're exactly right. That's ‑‑ evidence to that is all you need. You've got what you've got. You've got two people. You've certainly got two people who are adequate class representatives, which is the wrinkle here that doesn't arise in an EEOC case. But Judge Henderson said you do have adequate class representatives, so you proceed to Stage 2 and you don't lift the injunction, even though every single person in the class hasn't at this point in Phase 1 been shown to be a qualified individual with disability. If you had to show that, which UPS seems to suggest you do, in order to get class-wide, as they call it, relief, which means injunctive relief, you'd never have a class. You'd never have a pattern of practice. You'd never have a bifurcated proceedings. You'd only have individual Kennedy versus Applause type situations, which is fine except where you've got a blanket exclusion policy like this, which is adversely affecting large numbers of people. It's just not efficient to try the case like that. So we think that UPS's, I mean, excuse me, the district court decision is completely supportable, and we would urge the Court to affirm. Thank you very much. We have a little extra time because the opponents had a little extra time. So let's say four minutes or so. I think that will even it up. Thank you, Your Honor. You asked Judge Berzon who has the burden. The plaintiffs have the burden on qualifications, and this was true in the ADEA cases as well. Both Teamsters and Rodriguez required that the plaintiffs prove that they were otherwise qualified to do the job. In fact, Rodriguez, the Supreme Court, decertified the class and dismissed the case. But, you see, those were cases where you didn't have this blanket announced policy. I mean, let's take a Title VII hypothetical. Suppose the policy under Title VII was we will not hire any black people, any African-Americans. Does every ñ in order to bring a lawsuit, does an African-American have to prove that they're qualified for the job, or can they simply prove that they were not considered and that that's a sufficient injury in itself? Your Honor, if it's for every job, they would only have to prove that they were black. However, if it was for a job that required, for example, a machinist certificate or a college degree or some other non-challenging ñ Oh, would they? They might to get damages, but would they, in order to get an injunction to get themselves considered, couldn't they just come in and say we want an injunction that you have to at least consider us? No, Your Honor. They would have to show the non-challenged qualifications. That's footnote ñ I don't think that's correct. It's footnote 53 of Teamsters and it's footnote 9 of Rodriguez make that point explicitly in the ADEA. But those were not cases with explicit policies, were they? Yes, they were, Your Honor. The allegation, and as it came to the Supreme Court, was that the trucking companies would not let blacks or Spanish-surnamed people drive the over-the-road-line driving vehicles. But that had to be proven up. There wasn't an explicit announced policy in advance. And it came to the Court in Rodriguez that it had been proven that it was a blanket policy, and the Court decertified the class and dismissed the case because even though these plaintiffs had been subjected to the policy, they didn't meet the other qualifications because they had too many accidents. Just like Mr. Habib never put in his driving record, there's another point, Your Honor. Mr. Habib does not seek driving work. The Court found that in his case. Mr. Olliette is contractually barred from seeking driving work. Neither of those plaintiffs has constitutional standing to seek an injunction. They couldn't get it in an individual action. They can't get it in a class action. There's no evidence that any other member of the class is qualified and affected by this policy. The EEOC says that these standards are minimal. Your Honor, they put up 15 class members that mentioned driving in their testimony. If these standards are minimal, they could have proved it up. The Court is entitled to and ought to draw the inference against the plaintiffs that if they put in the driving records, they would have shown accidents, they would have shown moving violations, they would have not been able to establish it. That's the only reason to explain why they didn't meet their burden of proof. And as the case comes to this Court, there simply is no case to adjudicate. Teamsters doesn't fit very well with the ADA. It is difficult in most cases because of the disability determination. And here what the District Court did was tie UPS's hand. It said you can defend one defense, business necessity, but you can't put on evidence of the available driving jobs in various centers. You can't put on evidence of a whole variety of other things. This isn't a Teamsters case. This is an oddly bifurcated trial in which we have now an injunction for UPS to develop a plan that there's no evidence that it exists when we may still have a defense to every single class member's claims under other defenses available to us under the ADA, including particularly our seniority policies and other aspects of the undue hardship defense. We suggested as an alternative simply staying the injunction. If the Court doesn't agree with us, we submit in the first place that we did prove up the business necessity test and the case should be over. But if not, stay the injunction, go back for what's called Phase 2, and let us see if anybody has actually got a concrete and redressable injury before ordering the company to do this. The plaintiffs say that's unprecedented. That's not true. Their number one precedent, the EEOCs and the plaintiffs, is this Duvall v. Webb case that comes out of Colorado. If there's nobody in qualified, the injunction doesn't hurt you, is that right? No, Your Honor. The injunction prohibits us from applying what otherwise is our policy of extending the DOT standards across the board. We would have to go out and individually determine all these qualifications rather than simply comply with our lawful policy. It is their burden. I mean, that's sort of a circular problem. The reason we don't know if there's anybody who's qualified is because you've been barring the door at the outset. So if you simply now make the qualification determinations and it turns out they're not qualified, then they won't drive and the – but the policy won't stand as a barrier to finding that out. Your Honor, that's – the problem with that is that the policy may not actually affect anybody who is entitled to either sue, to challenge the policy in the first place, or to obtain relief at the end of the day. Not because of the policy, but because of the non-challenged qualifications of the job. There's a very complex industry with the union seniority rules. And the plaintiffs, you know, we haven't even got to that part of the case. If it is the case that there is no plaintiff that can drive for UPS, and there's no evidence that there is any such plaintiff, then putting us under an injunction to change our rules when there's been no showing that we violated the law is a self violation. And so we would submit unlawful, because we haven't got to the end of the case yet. We've – you've only found at that point. There are people who have applied in the past at a time when they were eligible. Is that correct? As far as seniority, and let's – just in terms of seniority and which jobs they have and so on. We know of one such person in the record, Your Honor, which is Ms. Morton, who no longer works for the company and – I thought that the two – at least one of the two current plaintiffs did apply at a time when he was in a property job. No, Your Honor. He isn't now. He applied during – between 1998 and 2000, and at each of those times, he had at least one moving violation on his record during the past year. But I didn't ask you that. I asked you what – with regard to his position in the company, his seniority eligibility. There's no evidence that he had seniority – driving seniority eligibility at that time. There is evidence that there are no driving jobs at the primary center where he works, and there are no driving jobs in non-DOT vehicles in the secondary center where he works. So he can't get a driving job. I mean, these are the problems that are inherent in these cases. They are individualized. It's not enough to say this is a blanket policy. The question is whether this blanket policy actually discriminates against anybody in an unlawful fashion prohibited by the ADA. We haven't reached that on this record for a variety of reasons, including business necessity, and we certainly have a long way to go before we're ever going to reach it, and we submit that that day will never come. But we think that so far, we haven't got there. Thank you very much. Thank both counsel for useful arguments. Your Honor. Interesting case. And the case of Bates v. United Parcel Service is submitted, and we will recess until tomorrow morning. Thank you very much.
judges: B. Fletcher, Gibson, Berzon